## Case No. 6,616.

### HOLLINGSWORTH v. DUANE.

[Wall. Sr. 77.] [1]

Circuit Court, D. Pennsylvania. May 22, 1801.

CONTEMPT—PUBLICATION PENDING SUIT.

Any publication, pending a suit, reflecting upon the court, the jury, the parties, the officers of the court, the counsel, &c. with reference to the suit, or tending to influence the decision of the controversy, is a contempt of the court, and punishable by attachment.

[Cited in Piper v. Pearson, 68 Mass. (2 Gray) 121; People v. Wilson, 64 Ill. 227.]

[1] [Reported by John B. Wallace, Esq.]

[This was an attachment for a contempt in connection with Case No. 6,615.

[The plaintiff in this case had succeeded in securing a verdict against the defendant for a libel published in his paper (Case No. 6,615), in consequence of which the defendant published the article mentioned below, reflecting upon the action of the court, and the present proceedings to attach him for contempt were instituted.]

Lewis, on a former day, had produced in court No. 3171 of the General Advertiser, commonly called "The Aurora," published by the defendant Wm. Duane in the city of Philadelphia, which contained the following paragraph:

"Wednesday 20th May.

"The Age of Revolutions!

"The recent trial in the circuit court has exhibited many curious occurrences: among others,

"Infinite pains, expense, and zeal, were employed to confer the last stroke of infamy on an American by stigmatising him with the title of a British subject!

"The open and uniform adherents of the British government, concurring in the sentiment that to be a British subject is infamous!

"The prosecutor and the prosecuted agreeing, that to be a British subject in America is infamy!

"Old Tories the most active in establishing this most infamous of verdicts!

"Men saved from the gallows, and a public execution for treason against American liberty, by the benignity of a republican chief justice, converted to the opinion, that to be a British subject in America is to be infamous!

"Old Tories proving their attachment to republican government by professing hatred of British subjects!

"Struck juries and Mr. Adams's Judiciary Law, giving very happy exemplifications of the moderation and the kind of justice which republicans are to expect from their adversaries!

"Moderation in the mouths of Tories, daggers and dungeons in their hearts!"

Having proved by an affidavit annexed, that the paper was purchased at the defendant's office, Lewis obtained a rule on him to show cause this day, why an attachment should not issue against him, for a contempt of the court, in reflecting upon the proceedings, pending the suit, &c. Upon coming on of the rule, some question arose as to the order of proceeding.

Mr. Ingersoll cited Rex v. Read, Vern. & S. 295, and Long v. Elways, Mos. 250, relative to the exhibition of interrogatories.

GRIFFITH, Circuit Judge. The mode of proceeding in this case is very clear of difficulty. The prosecutor has proved by an affidavit, that the paper was published at the office of the defendant, and that he is the

editor. The editor is called on to show cause why an attachment should not go on against him for it, as a contempt of the court. On this rule he may controvert the fact by affidavits; he may explain; or palliate; he may contend on any legal ground that the court ought not to award an attachment; in short, he may defend himself in person or by counsel, as he is advised. At this time, no question can be made about interrogatories. The prosecutor must prove, and he has already proved the publication. When the defendant has made his defence, we shall discharge the rule, if on any grounds, we think an attachment ought not to go. But if we are of opinion that the fact on which the rule is taken, is not sufficiently answered or excused, and that in point of law a contempt has been incurred, we shall direct an attachment to issue. When this is done, and the defendant brought in upon the attachment, he may submit his contempt without interrogatories, to the court, or he may demand of the prosecutor to file interrogatories, stating the questions on which the contempt turns; and if on his oath, he gives such answers as purge him from criminality, he must be discharged, and the prosecution falls to the ground. This right to demand interrogatories is in his favor; he is not obliged to ask for them, nor can the court force them upon him. If he will not pray interrogatories, the matter of contempt being proved by the affidavit or other testimony of the prosecutor, to the satisfaction of the court, they will give judgment against the offender being in custody on the attachment. On this point of interrogatories, there is certainly a diversity of opinion in the books (see 6 Mod. 73; 4 Bl. Comm. 287; Rex v. Beardmore, 2 Burrows, 792; Rex v. Edwards, 4 Burrows, 2105; Rex v. Read, Vern. & S. 295; Long v. Elways, Mos. 250; Rex v. Sims, 12 Mod. 511; Respublica v. Oswald, 1 Dall. [1 U. S.] 328); but I take the law here to be as laid down above. If the defendant's counsel can show any cause against the attachment, they may do it after the counsel for the prosecutor opens the nature of the rule, and the grounds on which he proceeds.

Mr. Lewis, for prosecutor.

An infamous libel having been published by the defendant in his paper, the Aurora, against Levi Hollingsworth, the latter, to vindicate his character, and inflict on the defendant such damages as a jury might deem adequate to the injury, instituted an action in this court for redress. The defendant pleaded to the jurisdiction of the court; that plea was tried on Monday last, and the jury found a verdict against the defendant. This, however, did not terminate the cause, the same being, as yet, pending, and on account of an informality, to be tried over again on the damages, at the next term. The day but one after the trial, the defendant, in his paper, published an account of the proceedings and trial, in which he reflects on the plaintiff in the most gross and scandalous terms; abuses the jury by the most reproachful epithets, and the verdict, he styles the "most infamous;" attacks the system of struck juries generally; and the judges who tried him are implicated as acting with partiality and injustice; and in short, representing the trial collectively, and all concerned in it, as actuated by the most depraved and wicked motives: (here he commented on the different passages of the paper.) This is certainly one of the most flagrant attacks which was ever made upon the honor, independence, and character of a court of justice; and unless punished in an exemplary manner, courts will become contemptible, useless, and even pernicious. It is of the last importance, that a party should proceed in his judicial course for redress, free from any influence but that of the regular and standing operation of the law. His character, his cause, his proceedings, the witnesses, the judges, jurors and officers should be subject to no extraneous impression, fears, or control. If lawless men, void of decency, and urged on by passion and interest, shall be permitted to vilify and insult judges, jurors, witnesses and the parties, what must ensue but a total perversion of justice, and indeed, almost the extinction of justice itself? Jurors will not serve, witnesses may be made to suppress or pervert the truth, the judges themselves may feel their independence attacked, and the parties and their counsel will be intimidated in their proceedings. To prevent such direful consequences, and to secure to every man the peaceful and impartial investigation of his claims before the tribunals of his country, the law is, that pending a suit, it is a contempt of the court to publish either false accounts of their judicial proceedings, or even true ones, without proper permission, (4 Bl. Comm. 285.) or any other matter tending to influence the course of justice, or reflect upon the persons and parties concerned in its execution. That this was an offence falling under the head of "contempt of court," and punishable as such, would admit of no controversy. It was the law of England, of Pennsylvania, of the United States; it must be the law every where, or no law would long exist any where.

Sir William Blackstone (volume 4, p. 285), in considering the law of contempts, says: "Some of these contempts may arise in the face of the court; as by rude and contumelious behaviour; by obstinacy, perverseness, or prevarication; by breach of the peace, or any wilful disturbance whatever: others in the absence of the party; as by disobeying or treating with disrespect the king's writ, or the rules or process of the court; by perverting such writ or process to the purposes of private malice, extortion or injustice; by speaking or writing contemptu-

ously of the court or judges acting in their judicial capacity; by printing false accounts (or even true ones, without proper permission) of causes then depending in judgment; and by any thing, in short, that demonstrates a gross want of that regard and respect, which when once courts of justice are deprived of, their authority (so necessary for the good order of the kingdom,) is entirely lost among the people."

Pool v. Sacheverel, 1 P. Wms. 675, Lord Parker, Chancellor, anno 1720: A marriage had been adjudged in the spiritual court, and affirmed in the delegates, between Sacheverel and his maid servant, and afterwards a trial had in the common pleas about the title, wherein the fact of the marriage was again found. The proof of the marriage was an entry in the register of the Fleet prison, 27th November, 1705, between Robert Marshall and Anne How; in her answer she said Sacheverel was married to her under that name. One Pool, who married the daughter of Sacheverel by the first wife, brought a bill before Parker, Lord Chancellor, against the pretended second wife (the maid,) Sacheverel being dead, touching the real and personal estate. While this suit was depending, the father of Pool put an advertisement in the Daily Currant, offering a reward of £100 to whoever would make legal proof, that there were persons really of the names of Marshall and How, who were married, and to whom the entry of the 27th November, 1705, referred. On motion to commit Pool, (the father) after great consideration the Lord Chancellor committed him. He observed, "that this tended to the subornation of witnesses; was very dangerous, and not only greatly criminal, but is a contempt of the court, being a means of preventing justice in a cause now depending, which is aggravated by the marriage having been pronounced good in the court of delegates, and also a verdict at the bar of the common pleas in its favor; and as the court may, so it ought in justice to punish this proceeding." It was objected that nothing had been done in consequence of the advertisement; that it is not an offer to a particular person; that a person coming in for such reward, is no witness. These objections were overruled. It was said the matter was over by the sentence in the spiritual court and the trial in B. C. But per Lord Chancellor King: "It is not over; for suppose, on the reward offered by this advertisement, a dozen of affidavits should come in, proving what is desired, this might induce the court to grant a new trial, and overturn all the former proceeding. It is a reproach to the justice of the nation, and an insufferable thing, to make a public offer in print to procure evidence, and is tantamount to saying that such persons as will swear, or procure others to swear, shall have £100 reward, and this in a cause now depending here; and though the intention of the party so advertising may

be innocent, (and I, knowing the man, believe it was so; insomuch, that if a court may be said to have inclinations or impressions from thence, I must own I should be influenced by knowing Mr. Pool to be an honest man,) yet the justice of the court, nay, the justice of the nation being concerned in so public a case, I cannot dismiss the party, though his counsel offer to pay costs to the other side; but in justice and for example's sake, he must stand committed."

2 Atk. 469, Hardwicke, Ld. Ch. anno 1742: This was a motion to commit the printers of the Champion, and of the St. James's Evening Post, for publishing a libel upon the defendant, in a cause depending before the court, and for reflecting upon the witnesses. In this case the chancellor said "that nothing was more incumbent on courts of justice, than to preserve their proceedings from being misrepresented; nor is there any thing of more pernicious consequence, than to prejudice the minds of the public, against persons concerned as parties in causes, before the cause is finally heard. It has always been my opinion, as well as of those who have sat here before me, that such a proceeding ought to be discountenanced. But to be sure, Mr. Solicitor General has put it on the right footing, that though this should be a libel, yet unless it is a contempt of the court, I have no cognizance of it. For whether it is a libel against the public, or private persons, the only method is to proceed at law. The defendant's counsel have endeavoured two things: 1st. To show the paper not defamatory. 2nd. If defamatory, yet no abuse upon the proceedings of this court and therefore no room for me to interpose. The letter is artfully written, but taking the whole together, there can remain no doubt with every common reader at a coffee-house, but this is a defamatory libel. It is also plainly levelled at the executors, parties in this cause, though their initials only are used; but all libellers now know, that printing initials will not serve their turn: even feigned names wont do. It is true the court is spoken of with respect; but that is colorable only, and such colors shall never impose on the court. There are three different sorts of contempt.—One kind is scandalizing the court itself. There may be, likewise, a contempt of this court, in abusing parties who are concerned in causes here. There may be also a contempt of this court, in prejudicing mankind against persons before the cause is heard. There cannot be any thing of greater consequence, than to keep the streams of justice clear and pure, that parties may proceed with safety, both to themselves and characters. There is the Case of Rakes. There are several other cases of this kind; one strong instance of Captain Perry, who printed his brief before the cause came on; the offence did not consist in the printing, for a man may give a printed as well as a written brief to counsel; but the contempt of this

court was, prejudicing the world with regard to the merits of the cause, before it was heard. On the whole, there is no doubt this is a contempt of the court," &c. And the printers were committed.

2 Ves. Sr. 520, anno 1754, Hardwicke, Ld. Ch.: It appears by this case, that the chancellor had committed Mrs. Farley at the instance of the plaintiff, for publishing an advertisement relating to an answer by Sir Robert Cann, the defendant, at his request; he had also committed Cann. On the motion to discharge them upon submitting, paying costs, &c., lord chancellor said: "His reason for committing, was not only for the sake of the party injured by such advertisement, but for the sake of the public proceedings in this court to hinder such advertisements, which tend to prepossess people as to the proceedings in the court."

Our own judicatures have every where acted upon these principles, as their undoubted right, as incidental to the execution of their powers of office, and sanctioned by immemorial usage. In Oswald's Case, 1 Dall. [1 U. S.] 319, some attempt was made to question the right of the court to punish as for a contempt, printed publications, pending a cause, tending to prejudice the public mind relative to the parties, and to bring suspicion on the impartiality of the judges. This was supported on the 9th section of the Pennsylvania bill of rights, which declares, "that in all prosecutions for criminal offences, a man has a right to be heard by himself and his counsel; to demand the cause and nature of his accusation; to be confronted with the witnesses; to call for evidence in his favor, and a speedy public trial by an impartial jury of the country, without the unanimous consent of which jury, he cannot be found guilty; nor can he be compelled to give evidence against himself; nor can any man be justly deprived of his liberty, except by the laws of the land, or the judgment of his peers." The declarations in the bill of rights (section 12), "that the freedom of the press shall not be restrained," and in the constitution of Pennsylvania (section 35), "that the printing presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any part of the government," were also insisted on, as exempting Oswald's publication from the cognizance of the court. But the chief justice, (McKean,) and the other judges, were clear in their opinion, and satisfactorily prove that contempts of the court, by reflecting and libellous aspersions tending to defeat and discredit the administration of justice, were no way affected by these constitutional declarations. They held, "that he who attempts to raise a prejudice against his antagonist, in the minds of those who must ultimately determine the dispute between them; and who for that purpose, represents himself as a persecuted man, and asserts that his judges are influenced by passion and prejudice,

wilfully seeks to corrupt the source, and to dishonor the administration of justice." Page 325. They held it to be a contempt of the court, and that it was their undoubted right and duty, to punish it in a summary way, as in other contempts; and they did so by fine and imprisonment. The chief justice (McKean) in delivering the sentence said, "that doubts had been suggested (by the defendant's counsel) whether even a contempt of the court was punishable by attachment; but not only my brethren and myself, but likewise all the judges of England, think, that without this power no court could possibly exist; nay, that no contempt could indeed be committed against us, we should be so truly contemptible. The law on the subject is of immemorial antiquity; and there is not any period when it can be said to have ceased or discontinued. On this point, therefore, we entertain no doubt," &c.

The publication now before the court, is of a complexion of the deepest dye; containing the most false, abusive, and contemptuous imputations; attacking the character of the plaintiff, representing him in the most odious and criminal lights; charging the jury with having rendered a most infamous verdict; reflecting upon struck juries in general, and upon the administration of justice in this court. He urged that all this was done, pending the cause, and during the sessions of the court, and almost in its very view; and above all, that the whole representation was wicked, false, and malicious, within the knowledge of the defendant, whose trial had been fair, impartial, and even indulgent, and so entirely satisfactory, that his counsel had not even suggested a scruple, as to the strict propriety either of the law, or the verdict of the jury. He insisted, that the contempt far exceeded that of Oswald's, which in comparison with this, might be termed decorous and innocent; and, that unless the court would secure its own independence, and the just claims of all persons and parties to protection against public insult and abuse, for doing their duty under the most solemn sanction of law and the constitution, in cases depending, the court would sink into contempt, trials would be governed, not by law and evidence, but by the agency of a scandalous and corrupting licentiousness of the press; and that all concerned in the administration of justice, must soon quit their stations, or their virtue and independence become the sources of the greatest injuries to their feelings, their families, and fortunes. He cited many cases in the supreme court of Pennsylvania, in which contempts of this nature, had been held punishable in this way: as Lessee of Hurst v. Britton, Wright v. Updike, the case of S. F. Bradford, (a case in Chief Justice Kinsey's time), and Republica v. Carol.[1] He added, that if the principle of Oswald's case [supra], or the precedent there established, needed any confirmation, they had received the sanction of the legislative assembly of Pennsylvania, on

---

[1] [Unreported.]

his memorial of the 5th of September, 1788, to impeach the judges. On this memorial, it was resolved, "that the house, having, in a committee of the whole, gone into a full examination of the charges exhibited by Eleazer Oswald, of arbitrary and oppressive proceeding in the justices of the supreme court against him, are of opinion, that the charges are unsupported by the testimony adduced, and consequently, there is no just cause for impeaching the said justices."

Mr. Dickerson showed cause.

The contents of this paper have been greatly misrepresented, and its criminality, if there be any in it, much exaggerated. It must be allowed, that there is some bitterness of complaint in it, and several expressions of a nature to excite uneasiness in the mind of the plaintiff; but the remarks are of a general nature, not pointed at the plaintiff, nor at the jury, nor at the court, by any precise allegation. The insinuation of the plaintiff's being a Tory, cannot operate, in the least, to his prejudice, in the future stage of the cause, nor can any thing said of this jury. In fact, the verdict in the abstract only, is spoken of as infamous, that epithet by no means being applied to the jurors. As to the judges of the court, not a word is pointed at them; and upon the whole, the publication cannot be viewed as likely to have any influence upon the merits of the future controversy. (He here attempted to show that the paper contained no reflecting matter.) 1st. The assertions may be all fairly explained, so as to bear no contemptuous meaning; or at least, as only applicable to what is past, not what is to ensue. The defendant in his publication, speaks of a point already decided, and it has not been contended that mere libellous matter, after a question decided, can be the foundation of a summary proceeding, as for a contempt. 2d. But upon constitutional and legal principles, it may be questioned, whether the case now before the court, is proper for their interference in this way. This method of trying and punishing at the discretion of the court, upon attachment, without the intervention of a jury, under an allegation of contemning or offending the court, must be looked upon as the exercise of a jurisdiction unfriendly to liberty, dangerous to the citizen, and easily capable of being perverted to the most oppressive purposes. It is evidently, therefore, the duty of judges to admit complaints of this nature with great caution, and to reject every attempt to introduce this summary and arbitrary mode of trial, except in cases where it is absolutely necessary to the attainment of justice. There are, indeed, many instances in which the court possess the power of fining or imprisoning for contempt, by attachment, or in a summary way, officers of the court, being under its immediate command and superintendance, and, by accepting the office, tacitly submitting to this mode of coercion for delinquency, may be punished in this way. Jurors, summoned to attend, and absenting themselves, or being guilty of negligence or contumacy, may be so punished: for to proceed in the ordinary way by indictment, would be too slow to effect the necessary purposes of justice. So for contempt of the process of court, there can be no other effectual redress; the course of justice must be stopped, if the courts could not compel obedience to their rules and orders, by fine and imprisonment. So for irregularities and misbehaviour in the face of the court, instantaneous punishment is essential to the existence of the court; it could not proceed without this power. But it cannot fairly be contended, that it is essentially necessary to the ends of justice, that contemptuous words or libellous publications, not any ways impeding the cause, and pronounced, or printed out of the view of the court, need to be punished in this way. What if the defendant libels his adversary, or even abuses the judges, may not the cause proceed with equal celerity, and does it necessarily follow, that such publications will do injury to the party? Would not the ordinary, solemn and impartial course, by action or indictment, sufficiently punish, and equally deter men from such abuses?

GRIFFITH, Circuit Judge. Mr. Dickerson, conceding this publication to be a libel upon the party, and a contempt of the court, and there being no statute on which contempts are indictable; will an indictment, as at common law, lie against the offender?

Mr. Dickerson. I am not prepared to answer that question: perhaps an indictment would not lie. But what I would prove, is, that let the mode of redress be what it may, the one now adopted is inexpedient, dangerous, and unconstitutional. By the constitution of the United States (article 3, § 2), it is declared, that "the trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held," &c. And by the eighth amendment, it is declared, that, "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state, &c.; to be informed of the nature and cause of the accusation; to be confronted with the witnesses," &c. These are explicit terms, and of the highest possible authority. If the publication in question is criminal, if contempt of court be a "crime," then it falls within the above constitutional provision, which declares that "the trial of all crimes, except on impeachment, shall be by jury." It will be found difficult to reconcile the present proceeding with the plain and solemn definition and injunction of this great charter; and though it must be admitted, that some cases of contempt are not to be proceeded on by indictment, yet it does not therefore follow that every case of this sort is excepted out of the provisions of the constitution. It is much safer to narrow than to enlarge the sphere of

summary punishments; and without absolute necessity, courts of justice should avoid the exercise of a jurisdiction, confessedly of an arbitrary complexion, in violation of the general principles of the common law, repugnant to the broad terms of the constitution, and when enforced by judges of the greatest impartiality and moderation, still liable to invidious reflections and jealous surmises. It will be difficult for the bulk of mankind to believe, that he can be wholly impartial, whose reputation and dignity have been attacked, or a dispassionate and equitable executor of the law, who sits to judge and to punish an offence committed against himself. Does this species of contempt, then, if it be one, necessarily call for this mode of redress? It would seem not. The great distinction I lay down, between those contempts which may, and those which may not be punished by attachment, is this: Where the contempt goes to resist, or stop, or evade the process or orders of the court, so that, without immediate coercion, the proceedings of the court must be impeded or defeated, there a summary correction of the abuse is requisite; as on subpoenas for witnesses, rules of the court, process to answer, &c. So against officers of the court, jurors, attorneys, and generally, in cases where the attachment itself is the agent for executing or enforcing the very matter of right or controversy between the parties, where without it, the court could not proceed to give the suitor a prompt and adequate remedy. The cases which must daily occur of this kind, are very many; and they constitute the bulk of precedents on this head. Blackstone, in his Commentaries (volume 4, p. 283), draws the distinction; he says: "The contempts that are thus punished are either direct, which openly insult or resist the powers of the courts, or the persons of the judges who preside there; or else are consequential, which (without such gross or direct opposition) plainly tend to create a disregard of their authority." By looking through the classes which he enumerates, it will be seen that the line I have laid down may be readily drawn. 2 Hawk. P. C. 230; 1 Salk. 84; 1 Strange, 185; 2 Strange, 1068; Sayer, 47, 114,—will show in what instances this power may be properly used, as necessary to the execution of justice between the parties, or the preservation of the court itself. But can it be proved, that newspaper publications, commenting on the proceedings of the courts of justice, or treating the parties and the judges disrespectfully, and even contemptuously, may not be punished, if they are criminal, in the ordinary method by jury, with sufficient dispatch and effect?

Does the publication in question, or any act of the defendant for which he is now brought before the court, interrupt the proceedings in the cause, or prevent the court in any manner from administering law and justice to the parties? If he is punished, will the cause be advanced; will any one point be settled be-

tween the parties? Does it not all end in mere personal punishment; is it not all merely for example; and if so, why is it not competent to the ends of mere criminal justice, to proceed according to the course of trial by jury, against the defendant in this case, as for any other criminal violation of the laws of the country? If it were even admitted, that upon the principles of the constitution, the court might proceed in this way, still, the argument, from policy and motives of prudence, is sufficient to repel this mode of proceeding, and put the prosecutor to a public prosecution by presentment and trial. In Rex v. Revel, 1 Strange, 421, it is laid down, that for contemptuous words spoken of a justice of the peace in execution of his office, it is optional to proceed by attachment or indictment. So in Rex v. Gray, 1 Burrows, 510, and Rex v. Jolliffe, 4 Term R. 285, for publications at nisi prius, designed to influence the trials, informations were ordered, and not attachment.[2] As to the cases which have been cited to warrant this proceeding, those from the chancery ought to have little weight. It is a peculiar jurisdiction. The chancellor is, constitutionally, a judge of law and fact; and there seems to be no such violation of the trial by jury, in his undertaking to try a misdemeanor committed in the course of the cause, tending to the perversion of the course of justice in his court.

The elementary writers on the English law, such as Hawkins, Blackstone, and others, lay it down, under the head of contempts, that publications, pending a cause, tending to influence the jurors, suborn or intimidate the witnesses or counsel, bringing odium on the party with reference to his suit; impeaching the integrity, or reflecting on the capacity of the court, are properly, and have been immemorially, punished in this way. But it must be remembered, that we have not adopted every tenet of the British jurisprudence. Our government rejects many of them, as incompatible with the general principles of liberty; and what is of more consequence to observe, the constitution of the United States has interposed the most solemn and explicit barrier between the citizen and a summary and discretionary mode of trial.

But it is said, the law in this country is settled; that defamatory publications, pending a trial and relative to it, are punishable as contempts of the court; that Oswald's Case in the supreme court of Pennsylvania in 1788, is decisive. I agree that case is law; (though a large minority in the legislature were

---

[2] Griffith, Judge. For contempts to inferior jurisdictions, not of record, nor having a general power to fine and imprison, (unless committed in presence of the officer and punished instanter,) there is no other method than by indictment. In the cases at nisi prius, last cited, an information or indictment was the only mode of proceeding; as the judge at nisi prius could not attach for the contempt; and as against the king's bench, none could be said to be committed against that court.

against sanctioning it;) but it is distinguishable from this. There the publication was before the trial, and invited the public to interest itself in his cause: it appealed to the jurors who were to try the question, and was plainly and openly avowed as a means of prejudicing the country against Brown, and the court. But here the observations are upon a past transaction; they apply to what has been done; they anticipate nothing; not a word is said relative to any future period of the cause. The plaintiff may be represented as having been a Tory, and as having been a traitor; the jury as having given an infamous verdict; the clerk as having been partial; the defendant as having been greatly injured by the proceeding, and the judges as having wilfully perverted the law. But what has this to do with, or how can it affect the trial or proceedings which may hereafter occur? As to the judges, indeed, nothing is said against them; the defendant was advised on that point before the publication, and it was conceived, that as the court was not reflected upon, there could not be any foundation for a proceeding of this kind. Upon the whole I submit: (1) Whether here is any such defamatory matter as will make the defendant answerable at all. (2) Whether upon the principles of the constitution, the court can punish in this mode. (3) If they can, whether it is expedient to adopt it; whether it is not better to put the prosecutor to proceed some other way.

· E. Tilghman, contra.

There can be but two questions raised: (1) Is this publication a contempt of court? (2) If it is, has not the court power to punish it by attachment?

As to the first: It never was doubted by any lawyer or judge, that for any person to attempt by false, abusive, and artful publications, to influence or defeat a cause, while depending in court, was a contempt of the court. By the constitution and laws of the land, and from the essential nature of the thing, trials between man and man, for property, character, or other matter of controversy, must be decided in a due course of law, by judges and jurors, and upon the evidence and rules of action prescribed. When a suit is once brought, and the parties have put themselves upon the proceedings and decision of the proper judicature, for any one without any authority, any judicial character or concern whatsoever in the cause, or for one of the parties to take the cause, as it were, out of the court, and by an appeal to the ignorance or passions of mankind, by falsities or by misrepresentations, by abuse of a party or the court, or in short, by any, but judicial methods to attempt creating a bias, and prejudicing the legal decision of the cause,—this, of all other conduct, may be emphatically styled a contempt of the court. If indulged, if not checked instantly, it will sap the foundations of justice. It aims a fatal stab at the vitals of the constitution. The judiciary, instead of being the only independent and perfect safeguard of life, character, and property, will be reduced to the most contemptible condition, the sport, and insignificant tool of the very parties who come to it for redress! I ask, whether any good man, any sensible man, any man who really has a regard for true liberty and law, is prepared to advance the position, in earnest, that a court of judicature, competent to decide, and having cognizance of the cause by the constitution of the country, is to have no control over parties and others, so as to prevent or punish interferences in questions depending, calculated to defeat or prevent the very ends and objects of its institution? Liberty, and the true interests of man in society, can be maintained no longer, when the courts of justice, and their constituent members, shall be subjected in the very act of exercising their constitutional functions, to be insulted, intimidated, misled, or influenced, by interested and artful representations, or by bold and infamous calumnies vented through the medium of the press! The law is, it ever was, and while truth, and right, and safety, are the great objects of the judiciary, and the dearest interests of man, it must ever be a contempt, an unauthorized and insolent attack upon the justice of the country, for any man, a party or not, to interfere in judicial proceedings, under the mistaken and insidious pretext of the "liberty of the press." No such liberty exists; it would be liberty gone mad. What restraint, what unreasonable restraint can it be for parties and others to refrain from publications relative to each other and the merits of their judicial controversies, until ended judicially? What has the public to do with them? What end is to be answered, but to create false impressions, or to answer some purpose not attainable in due course of law? For these reasons it never has been questioned, nor will be, by any man attached to the constitution of the country, of which the judiciary is a branch, that publications of this kind are contempts of court. As to the paper in question, it would be offending the common sense of mankind, to enter further into proofs of its malignity, its falsehood, and abusive reflections upon the party, the jury, the court, the officers concerned in striking the jury, and indeed upon every body any way concerned in the prosecution. It was made, not only pending the cause, but sitting the court, and after the discovery of the informality, and express agreement to try the cause over again on the libel, at the next term. It is calculated and intended to render the plaintiff odious in the eyes of his fellow-citizens, to intimidate and influence the clerk, future jurors, the counsel concerned, and even the court, and to inspire a false and unmerited sensibility for supposed hardships inflicted on the defendant, than which nothing can be more unfounded; for not only was justice done, but never had a party more

indulgence extended to him. The most of his evidence was inadmissible, being merely. what he had told his witnesses, and yet the court received it, and gave him the full benefit of it in the decision.

But 2dly, if this be a contempt of the court, can it be punished by attachment? It has been stated, that this is an unconstitutional proceeding; it deprives the party of a trial by jury! If this argument be good for any thing, it must have an universal application, for the words of the constitutional articles are universal, that the "trial of all crimes shall be by jury." It is said, this is a crime, and therefore must be tried by jury. But should a witness refuse to give evidence, or to attend on a subpoena, should a party refuse to obey a legal order of the court, should an officer refuse to execute its legal process, should a juror refuse to be qualified, or misbehave by resisting confinement till a verdict be found, or would eat and drink, or quit his companions, nay, if men, in the face of the court, should commit violence, abuse its officers, or the court itself,—are not all these crimes, and by the construction put on the constitution, to be tried only by jury! This argument goes much too far; it would shut up the courts of justice. The truth is, that the "criminal prosecutions," and the "trials" spoken of in the constitution, and which it is declared shall be determined by jury, refer to those general and public offences against the United States, which, had they been committed against the separate states before the adoption of the constitution, would have required the presentment of a grand jury, and were triable by a petit jury. The constitution does not affect those proceedings in the tribunals of justice against officers and others, instituted at the instance of the party or the court, to coerce or punish them for contempts committed in the course of particular causes. Those are not the "trials" which it is said shall be by jury, in Const. art. 3, § 2; nor those "criminal prosecutions" intended by the eighth amendment, in which it is said, "It shall be the right of the party to have a speedy and public trial by an impartial jury," &c. Such an idea was never entertained by any one. The constitution does not make any alteration of the preceding law on this head; it gives no new right to the citizen, but merely secures those inestimable privileges from being abridged or destroyed by any legislative act of the federal government: it goes no further than Magna Charta. A construction, which deprives courts of justice of the necessary and useful authority of punishing contempts by attachment, is not to be admitted. It was not the intent of the convention to create a judiciary, and leave it so contemptible as to be incapable of executing the laws of the land. The power of punishing contempts, is part of the constitution of a judiciary. It could never be intended that misbehavior, and offences in and against the

courts, should be only triable by jury, and punishable according to the dilatory proceedings in that mode of trial. In short, the constitution leaves the judiciary, as to all offences committed against it, and which are punishable by fine and imprisonment, or attachment, without any control. I have never heard that the acts of the federal legislature which expressly authorize the courts to punish for contempts, were ever opposed, on that point in congress, as unconstitutional.

These acts are decisive on this point, for it is expressly enacted, "That all the said courts of the United States, shall have power to punish by fine or imprisonment at the discretion of the said courts, all contempts of authority in any cause in hearing before the same." 1 Story's Laws, p. 60, § 17 [1 Stat. 83]. This law to establish the judicial courts of the United States, was passed on the 24th September, 1789, not more than six months after the commencement of the federal government, by many of the very men who sat in the convention; and until this day the constitutionality of it has never been questioned in or out of congress. And the act which gave birth to this court, passed so late as February, 1801, § 10 [2 Stat. 92], enacts, "that the circuit courts shall have all the power heretofore granted by law to the circuit court of the United States, unless where otherwise provided by this act."

There is, then, the common law; there are express and multiplied adjudications both English and domestic; there is nothing contravening this jurisdiction in the constitution; there is an express act of congress almost coeval with the constitution, giving the power; and it is clear that without it, the judiciary itself must be annihilated. And are we at this time of day to question the authority of the court to punish for contempts! But what is the mischief? Why, the court may act arbitrarily; they may be violent and cruel in their discretion! This objection goes not to the power, or the expediency, but to its limitation. Yet, I trust, that discretion in this case will never be abused: when it is, let the constitutional remedy be applied. This discretionary power has existed in England time out of mind: it has been assumed and acted upon in all the courts there and here, from the commencement of the governments, and I know not an instance of abuse! What if a jury were to convict, in this case is not the punishment still discretionary? And how many other crimes are left for their punishment, to the discretion of the court? An exception which goes to the integrity and moderation of the judges, is levelled at the constitution itself. Government must trust its power to men, and when they are constitutionally selected, made independent, bound by oath and reputation to act well, and subject to impeachment for misbehavior, you have reached the summit of human security. If you seek for any thing more perfect, it will be necessary to bring down

judges from the skies. But the gentleman has given up his own position over and over again. He says, contempts may be punished summarily, but not this contempt. And why not this? Of all others it is most direct and pernicious. This very species we find the subject of attachment from the earliest times; and in Pennsylvania, where the constitution is full as strong in favor of jury trials and the liberty of the press as that of the United States, the supreme court has assumed an undoubted jurisdiction in these cases. It is not questioned; Oswald's Case is full in point: that is admitted to be a legal adjudication; and yet the publication was innocent, harmless, and polite, compared to this.

To conclude: This publication is a gross and flagrant contempt of this court; and the power and duty of this court give a right to inflict, and demand punishment in the ordinary and usual manner; and unless some example is made, it were better to settle controversies in any other way, than to appeal to courts only to mock their authority, and poison the streams of justice. The gentleman has not even pointed out any other mode of checking or punishing such offences. He has talked of some other; but when asked what it is, candidly says, he knows of none. I submit the question to the court, with no other sensation of uneasiness but what arises from having too long detained it on a point upon which, in my opinion, no judge or lawyer can entertain the shadow of a doubt.

THE COURT (TILGHMAN, Chief Judge, and GRIFFITH, Circuit Judge; BASSETT, Circuit Judge, absent) immediately gave an opinion. Each of the judges entered into the history of the trial, pointed out the gross falsities and unprincipled tendency of the publication. They stated, that no manner of doubt existed in their minds, either of the expediency or legality of punishing contempts of this nature by attachment; that in doing so, they neither assumed, nor designed to arrogate jurisdiction; they found themselves by their commission and by the laws of the land, in full possession of it, and bound by their paths and the high duties of their official station, to exercise a just and lawful discretion in punishing, and as far as they could, preventing by examples, an abuse, which if not repressed, must overturn the administration of justice. Individually, they disavowed any feelings but those of a desire to discharge their duty. The paper, as far as it reflected on them, (if it meant any reflection,) excited no resentment, They were, indeed, sorry to find that any man should be so lost to decency and truth, as to publish to the world, and in the face of so many witnesses of the falsity, such flagrant calumnies upon the administration of justice. The offence was denominated a contempt of the court; but it did not follow

that the judges must be attacked: it was equally a contempt when pending the cause, the party, his witnesses, or the jurors are reflected upon; or indeed, if the publication is only calculated to influence the decision of the controversy; the degree, indeed, may vary. They said, that though they knew nothing of the publication, till brought into court on this motion, they considered the prosecution as a meritorious attention to the true interests of society, and an advancement of justice. As to the manner, and with what moderation they should exercise their powers in case of the contempt being established, those were matters, about which they were to answer to their consciences and country. Intrusted with the execution of justice and the dearest interests of man, independent of power, and under every moral tie to perform their duty, they should proceed fearless of calumny, and above influence of any kind; and if it should be found necessary to punish, the degree should be such, as in their best judgments, might serve rather as an example to prevent future offences, than designed essentially to injure the aggressor.—They therefore directed that the rule for an attachment should be made absolute.

[NOTE. The defendant in the above case was taken into custody, and, in justification of his acts of contempt, attempted to show that they were provoked by a libelous article aimed at him, which had been published in Wayne's Gazette of the United States the day after the trial (Case No. 14,997). Thereupon a rule to show cause why an attachment for contempt should not issue against him was laid on Caleb T. Wayne (Id. 16,654), who evaded service, in consequence of which a new rule was laid upon him, with an order that service at his last place of abode should be sufficient (Id. 6,617).]