IN RE DAVID LEE,
IN RE PAT FRANK
[Nos. 57, 58, 81, 82, October Term, 1935.]

44

*Decided February 5th, 1936.*

The causes were argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Albert C. Ritchie* and *Stuart S. Janney,* with whom were *Ritchie, Janney, Ober & Williams* and *Peter & Simpson* on the brief, for the appellants.

*William L Henderson, Assistant Attorney General,* with whom were *Herbert R. O'Conor, Attorney General, Hilary W. Gans, Deputy Attorney General,* and *James H. Pugh, State's Attorney for Montgomery County,* on the brief, for the affirmance of the judgment.

SHEHAN, J., delivered the opinion of the Court.

The Circuit Court for Montgomery County passed orders on the 26th day of June, 1935, adjudging the American Newspapers, Inc., Pat Frank, and David Lee, guilty of contempt of that court.

The American Newspapers, Inc., was sentenced to pay a fine of $5,000, and Pat Frank and David Lee were each sentenced to be confined in the jail of Montgomery County for the period of ninety days. From this judgment and sentence David Lee and Pat Frank entered an appeal, and these cases are Nos. 57 and 58. The American Newspapers, Inc., paid its fine of $5,000.

On the 17th day of June, 1935, Pat Frank and David Lee filed motions to quash the writs of attachment, and to dismiss the order citing and requiring each of them to appear and show cause why they should not be held in contempt of court. Both of the motions were overruled. On July 1st, 1935, David Lee and Pat Frank filed motions to strike out the judgment and sentence of the court, both of which were overruled, and Lee and Frank appealed. These appeals are Nos. 81 and 82. The cases were heard in this court on the same assignment, one brief being filed upon the part of the appellants. These four appeals will be disposed of in this opinion. The appeals in 81 and 82 present no questions that require consideration other than those in Nos. 57 and 58.

In the beginning it should be stated that a flagrant and inexcusable contempt upon the authority and dignity of the Circuit Court for Montgomery County was practiced.

In the briefs and oral arguments, and in the proceedings, there is no denial that the newspaper publications set out in the record amounted to a contempt. There are two questions raised for consideration:

First: The validity of the procedure adopted and followed with respect to the prosecution of these cases; and

Second: Whether there is sufficient evidence to warrant the commitment of these two appellants for contempt.

At common law there was no appeal from the judgments or orders of the court in matters of contempt. *Kelly v. Montebello Park Co.*, 141 Md. 194, 118 A. 600; *Ex parte Sturm*, 152 Md. 114, 124, 136 A. 312, and cases there cited; *Rapalje on Contempt*, p. 141. But section 105 of article 5 of the Code (Supplement 1929) provides for an appeal by any person adjudged in contempt by any order or judgment passed to preserve the power or to vindicate the dignity of the court, and this right to appeal relates both to direct and indirect contempts. This section also provides that "upon appeal to the Court of Appeals, in cases of both direct and constructive contempts, the Court of Appeals shall consider and pass upon the law and the facts and said court shall make such order as to it may seem proper, including the right to reverse or modify the order appealed from."

The power and authority to punish contempts is one of common law origin and has existed in courts of law and equity since ancient times. It is an inherent right, and not dependent upon legislative authority, and relates to criminal, as well as civil, contempts, and to direct and indirect contempts alike. It is a power reposed in courts of civil, as well as criminal, jurisdiction. *Ex parte Maulsby*, 13 Md. 625, appendix; *Kelly v. Montebello Park Co.*, supra; *Telegram Newspaper Co. v. Commonwealth*, 172 Mass. 294, 298, 52 N.E. 445; *State v. Howell*, 80 Conn. 668, 69 A. 1057.

The divulging of judicial secrets has always been regarded as an interference with a proper functioning of courts and the administration of justice. The secrets of

the grand jury room, the proceedings of courts *in camera* and the like, must be respected and remain inviolate, and any persons violating these features of judicial proceedings are properly held in contempt. 6 *R.C.L.*, p. 514; *Telegram Newspaper Co. v. Commonwealth, supra.* The power and authority possessed by courts may not be destroyed or abridged by legislative enactment. It is recognized as a constitutional attribute, and is preserved as a necessary function of the judiciary. *Rapalje on Contempts*, sec. 11 (1884 Ed.) ; *Ex parte Maulsby, supra.*

Contempts are classified, first, as to the place of their commission. Direct contempts are those committed in the actual presence of the court, or so near to it as to interfere with the due and proper administration of justice, or in direct defiance of the dignity and authority of the judicial tribunal in question. Indirect or constructive contempts are those which do not occur in the presence of the court, or near it, as above stated, but at some other place out of the presence of the court and beyond a place where the contempt would directly interfere with the proper functioning of the court. This class of contempts has been designated in article 5, section 105, as such as "have been committed not in the presence of the Court, or not so near to the Court as to interrupt its proceedings." Again contempts have been divided into two classes with regard to their inherent character or nature, namely, criminal and civil, or punitive and coercive. In spite of the verbiage used to designate them, they are "neither wholly civil nor criminal." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797.

This classification has been the source of confusion and misunderstanding resulting in extensive litigation. Nevertheless, they are so recognized by this court *(Ex parte Sturm*, 152 Md. 114, 136 A. 312, and cases there cited), as well as by the Supreme Court of the United States, *Cooke v. United States*, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767. Criminal contempts at times were dealt with at common law by presentment, indictment, and trial, as

were other misdemeanors, and they were so regarded, but this did not deprive the court whose dignity had been assailed, or authority frustrated, of the right to deal with contempts of all classes, in accordance with the rules and procedure recognized since ancient times by the common law. Courts have authority to institute upon their own motion contempt proceedings against those persons whom the court has reasonable ground to suspect of contempt. Not only has the court this right, but as a judicial tribunal it is its duty to do so.

In this case the technical distinction between direct and indirect contempts is of little importance from a procedural standpoint, because the Circuit Court for Montgomery County has jurisdiction and authority to deal with contempts. The Code expressly says, in dealing with indirect or constructive contempts, that "If any such alleged contempt be a constructive contempt, alleged to have been committed not in the presence of the Court, or not so near to the Court as to interrupt its proceedings, then the Court shall issue a citation to the person alleged to be in contempt, requiring such person to show cause why an order adjudging such person in contempt should not be passed within a time named therein. If no cause is shown, within the time so named, such order shall be final; but if such person shall answer and show cause within the time named, then testimony shall be taken and the matter tried by the Court without a jury."

The entire defense was taken upon procedural and technical grounds and not upon the issue of fact as to whether or not Pat Frank and David Lee had perpetrated a contempt in obtaining the facts contained in the newspaper for which they were reporters, or in supplying information to enable that newspaper to wrongfully publish the article complained of. No answer denying or avoiding the charges was filed to the citation or to the affidavit of the state's attorney.

This paper seems to have been the only one publishing or carrying these articles, and this is substantiated by its statement: "The Washington Herald learned exclu-

sively last night." Then follows in detail the statement of facts that the paper claimed it had "learned exclusively."

The order issued is as follows:

"Order of Court.
"(Filed June 12, 1935.)

"In the Circuit Court for Montgomery County:

"Ordered by the Circuit Court for Montgomery County, this 12th day of June, 1935, that a citation issue to Pat Frank and David Lee and The American Newspapers Incorporated and Michael W. Flynn, its Managing Editor, and Ray Helgesen, its night City Editor, requiring them and each of them to show cause, on or before June 17th, 1935, why they should not be adjudged in contempt of this Court for making and publishing reports purporting to make disclosures as to a private conference of the judges of this Court in Chambers upon an issue to be determined by their verdict, and stating a conclusion alleged to have been reached in such conference, and for thus embarrassing and obstructing the administration of justice."

On the 21st day of June, 1934, the state's attorney for Montgomery County filed a comprehensive statement of facts concerning the alleged contempts, filing therewith as exhibits copies of the articles appearing in the Washington Herald. This statement, under the oath of the state's attorney, was served upon Miss Simpson, attorney for David Lee and Pat Frank, on the 21st day of June, 1935. In this case there is no contention that there was insufficient time for the preparation of the defense, nor can it be contended that the statement under oath of the state's attorney, and the citation issued by the court, do not fully and fairly apprise the accused of the charges against them.

These parties cannot contend that they are surprised or without knowledge of the nature of the contempt with

which they were charged, for it is an admitted fact that, during the preparation of the citation, counsel for both these men appeared before the court in their behalf and identified them as reporters for the Washington Herald, assigned to the case or cases on trial at Rockville. It would be idle to assume that counsel and accused alike did not definitely know the charge for which they were being cited, and then, too, within five days after the citation, there was a motion to dismiss the citation and quash the attachment, setting forth at length six different reasons why the citation should be dismissed and the writ of attachment quashed, thus showing complete knowledge of the charge. Testimony was not taken until fourteen days after the service of this citation. The defendants offered no testimony, although afforded ample time and opportunity to do so. The appellants were fully apprised of the nature of the charge, a fair trial was accorded to them, the procedure adopted afforded every reasonable opportunity for these parties to purge themselves of their alleged contempt, or to offer such testimony as they might think proper to clear them of the charges preferred. The procedure adopted was in accordance with the practice in many cases. The procedural requirements are stated in the case of *Cooke v. United States*, 267 U.S. 517, 45 S.Ct. 390, 395, 69 L.Ed. 767, where the Supreme Court said:

"When the contempt is not in open court, however, there is no such right or reason in dispensing with the necessity of charges and the opportunity of the accused to present his defense by witnesses and argument. The exact form of procedure in the prosecution of such contempts is not important. * * * 'All that is requisite to their validity is that, when not taken for matters occurring in open court, in the presence of the judges, notice should be given to the attorney of the charges made and opportunity afforded him for explanation and defense. The manner in which the proceeding shall be concluded, so that it be without oppression or unfairness, is a matter of judicial regulation.'

"The court in *Re Savin,* 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150, applied this rule to proceedings for contempt.

"Due process of law, therefore, in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either. to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed. See *Hollingsworth v. Duane* [Wall, Sr. 77] 12 Fed. Cas. 359, 360 [No. 6,616] ; *In re Stewart,* 118 La. 827, 43 So. 455; *Re Clark,* 208 Mo. 121, 106 S.W. 990."

See, also, case of *Kelley v. Montebello Park Co.,* 141 Md. 194, 118 A. 600, for procedure there recognized and adopted.

Aside from this, the Circuit Court for Montgomery County could adopt its own procedure, as none is fully prescribed by statute, so long as that procedure afforded to the accused a fair and reasonable opportunity to present their defense and to be informed of the substance of the charges against them, all of which was done; nor can it be contended that there was not due process of law within the rule laid down as above cited.

The accused were ultimately given every advantage by the court, in not acting summarily, but by filing the citation, followed by the affidavit of the state's attorney setting forth at length and in detail the charges, and then by a trial before the court in which the accused were represented by counsel, confronted by witnesses, afforded an opportunity to cross-examine, which they accepted; and to produce witnesses, offer testimony and to be heard in argument by counsel. These opportunities they declined.

In discussing the publication of articles in newspapers circulated in the place where a case is pending, which articles would have a tendency to influence such case, it has been recognized that the court will proceed on its

own knowledge of the facts, and upon its own motion pass a show cause order. This is supported by the case of the *Telegram Newspaper Co. v. Commonwealth*, 172 Mass. 294, 52 N.E. 445. In that case it was held to be unnecessary that a formal complaint be filed as a prerequisite to the issuance of a citation for contempt, because, just as in this case, there were facts and circumstances peculiarly within the knowledge of the court. When such publications come to the knowledge of the presiding judge of the court, which are calculated to prevent a fair trial, or to improperly influence the court or jury, or tending in any manner to interfere with the administration of justice, such court may, upon its own motion, institute proceedings for contempt. Such a contempt, interfering with the administration of justice, is analagous to a contempt committed in the presence of the court. It may be contended that obtaining the information so published, which must have been done in or about the court, in itself would be a direct contempt. It is held that the eavesdropping upon the deliberations of a jury or the court in chambers is a direct contempt, and in the case of *Ex parte Sturm, supra*, there was a direct contempt, even though not committed in the courtroom, consisting of taking pictures of an accused in the court house at Baltimore, but not in the immediate presence of the presiding judge.

It has been decided by the Supreme Court of the United States, in the case of *Cooke v. United States*, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767, and also in *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 31 S.Ct. 492, 499, 55 L.Ed. 797, "that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself." It is equally true that cases and text-writers agree that a person, when charged with contempt and cited to appear and show cause, must substantially comply with this order.

In the instant case the attack upon the procedure adopted was futile, and, as above stated, there has been

an entire failure on the part of the appellants to comply with this order. When their motions had been overruled, they had one of two courses to pursue. They could have then filed an answer or could have stood upon their rights as presented by their motions. The latter course they pursued, and having so chosen, they must abide the consequences.

*Hochheimer's Criminal Law,* sec. 300; *Tidd's Practice,* sec. 479; *Blackstone's Commentaries,* 4th vol., 286; 6 *Ruling Case Law,* p. 534; 13 *Corpus Juris,* p. 78, are to the effect that the passage of an order to show cause why one should not be held in contempt is not a mere gesture of the court, but has in it force and meaning, and places upon the accused an obligation to comply, that is, to deny or avoid the act which constituted the alleged contempt. In *Murdock's Case,* 2 Bland, 461, 486, the Chancellor said: "If the party attached makes a full and frank answer to all the facts, and positively denies or justifies all that is alleged against him, he must be at once discharged, as having entirely acquitted himself of the contempt imputed to him. I know of no instance in this court in which proofs and affidavits have been allowed to be introduced in opposition to the answer of the accused. If, on the other hand, the accused does not, by his answer, fully deny or justify the acts charged against him, he may be fined and imprisoned, or such terms imposed upon him as the justice of the case may require." In this connection we now have the effect of the statute above mentioned to consider.

Under the procedure adopted, it was open to appellants to deny their guilt by answer or in the motions filed by them. In this they failed, and the court must consider this case without the aid that such a course would have afforded.

We now come to the second proposition. Can the appellants be held for contempt upon the facts offered in evidence, and the inference to be drawn from their conduct in connection with the case on trial and their positions with relation to the Washington Herald, their

failure to answer the complaint, or to purge themselves of the charge against them?

There can be no doubt that there had been contempt of the Circuit Court for Montgomery county, tending to embarrass and obstruct the administration of justice and to flaunt the authority and dignity of that court. From the record, this is self-evident and requires no citations of authorities.

Succinctly stated, the question is: Were Pat Frank and David Lee, or either of them, responsible in this contempt by participating therein or contributing thereto?

Cases of a character to attract wide public interest were being tried at Rockville, Montgomery County. On June 10th, 1935, there was pending in the Circuit Court for Montgomery County a criminal charge against Anne M. Lyddane, John Martin Boland, and John Henry Carnell, who were jointly indicted for unlawfully conspiring to murder Francis S. Lyddane, the husband of Anne M. Lyddane. And on the 11th day of June, 1935, Carnell having pleaded guilty, and Boland having pleaded not guilty, and having elected to be tried by the court, he was on trial. Anne M. Lyddane pleaded not guilty, and elected to be tried by a jury and was awaiting trial. The case of Boland was completed on the 11th day of June, 1935, and the Honorables Hammond Urner, Charles W. Woodward, and Arthur D. Willard, the judges before whom the case was tried, retired from the bench in the court room to the chambers of the judges in the court house at Rockville, Maryland, to determine the guilt or innocence of John Martin Boland. After deliberating, they returned to the bench and Hon. Hammond Urner, Chief Judge, made his statement: "The court has reached a conclusion in this case and has agreed upon a verdict to be rendered, but we will first give the defendant, through his counsel, an opportunity to express his views as to whether or not he wishes the verdict rendered at this time or its

announcement deferred until after the conclusion of the case which will follow in ordinary course."

Counsel for Boland respectfully requested that the verdict be rendered after the conclusion of the case against Mrs. Lyddane, which was to immediately follow; whereupon the court stated, "The verdict will not be announced at this time." This was about 3:30 in the afternoon of June 11th, 1935. It is obvious that the lower court acted properly and with due regard for the interests of the parties concerned, and especially so that its verdict would not influence the verdict of the jury then about to be drawn in the trial of Anne M. Lyddane. On the evening of the 11th of June, 1935, being the evening following the announcement of the court that the verdict in the Boland case would not be announced at the time, the Washington Herald, a daily newspaper published at Washington in the District of Columbia, which has a large circulation in Montgomery County, printed and published and circulated in two issues of said paper, the one the 6 o'clock edition and the other the midnight edition, and on the front pages of said issues, an article purporting to disclose the discussions, deliberations, and conclusions of the judges while in chambers, and in secret conference, and purporting to reveal and disclose the verdict that the court had reached in the Boland case, and which would be rendered. This publication in the Washington Herald directly tended to frustrate the expressed intention and purpose of the court in withholding the verdict.

At the time of the trial, the appellants, Pat Frank and David Lee, were reporters on the Washington Herald and were assigned to report to the said newspaper the progress of the trial and matters pertaining thereto. These men were in Rockville on the 10th and 11th of June, were almost continuously in court during the trial, and were in and about the courthouse during the secret deliberations of the court. By some means the court's deliberations and the result thereof became known to the Washington Herald and were published by it and

widely circulated in Rockville and in Montgomery County. There is no question that Pat Frank and David Lee represented this paper at the time of the trial. When the court made the statement from the bench concerning withholding the announcement of the verdict, they were in the courtroom. Upon the information that the court had, they were both cited to show cause why they should not be held in contempt.

The facts known to the court at the time of the citation are contained in the court's certification, as follows: "The court certifies that the citations in this case were ordered by the court upon its own knowledge of the fact that the Washington Herald in its issues of June 12, 1935, published and circulated in Montgomery County a statement that the court had determined upon a verdict of 'Guilty' in the case of the State of Maryland against John Martin Boland, separately tried upon his indictment jointly with Anne M. Lyddane and John H. Carnell for a conspiracy to murder Francis H. Lyddane, said statement having been so published and circulated notwithstanding the court's actual and announced reservation of its verdict in the Boland case in view of the immediately impending trial of another of the alleged conspirators, the obvious purpose of reserving said verdict having been to avoid the effect which its rendition might have upon the jury about to be impanelled in the succeeding trial, and said published statement, in its purported disclosures as to the tenor and effect of the court's private and secluded conference in regard to the verdict to be rendered in the Boland case, being inherently conclusive as to there having been a resort to some eavesdropping method of frustrating the court's precautions to protect the secrecy of its deliberations. The identification of Pat Frank and David Lee as reporters of the Washington Herald attending the Boland trial was verified by their counsel, who appeared before the court in their behalf while the order for the citation was being prepared."

The judges knew whether some one had surreptitiously gained knowledge of the language, the purport and result

of their deliberations. They knew whether the newspaper account corresponded with what they had said and done in their secret conference. We must add to these facts and circumstances the disclosures in the testimony that was taken in open court. We find it generally accepted as a fact by other newspaper men on the scene that Frank and Lee had procured the information, because they conferred with them and sought to ascertain the means by which they had obtained the facts exclusively in their newspaper. By their conduct, as well as by their language, the appellants indicated that they knew how this information had been obtained, and at no time did they disclaim responsibility, even when they were accused of having acquired the information wrongfully.

The testimony of the witness Randall Benson concerning his conversation with David Lee is most significant. This conversation happened between 12:30 and 12:45, the early morning of the 12th. The testimony of this witness in part is: "Q. What, if anything, did he have to say to you in connection with the case of the State versus John Martin Boland? A. He told me that Boland had been found guilty, and my remark to him was he better be careful about that—'You better not print anything about it.' 'Well,' he said, 'You will read the story in the paper in the morning.' I said: 'My understanding is that the court has reserved their opinion in the case until the conclusion of the Lyddane case.' He said: 'Oh, we know what that is all about. You will read it in the paper in the morning.' 'My story is already in.' " "Q. Did he make a telephone call while he was in there? A. He was telephoning when I came in. I was over at a little bar next to the booth. Q. What, if anything, did you hear him say over the telephone? A. The only thing in my mind was what he stated about the case. I heard him make the remark 'Guilty.' When he came out of the telephone booth I asked him, 'Who was guilty,' and he said: 'Boland.' Q. You don't know Pat Frank, do you? A. No. Then again the witness said:

"Q. And the conversation was to the effect that Boland

had been found guilty? A. Yes, sir. Q. That the story would be in the Washington Herald? A. Yes. He said: 'You read it in the Herald in the morning.' Q. he said, 'You read it in the Herald in the morning.' A. (Witness shakes head, 'Yes.')" Redirect Examination (by Mr. Pugh) : "Q. And he said that 'We know what it is all about' when you told him about this? A. When I entered the conversation about the publication, I didn't know that it had been published. I said: 'You are liable to get in hot water.' And he said: 'We know all what it is about.' That was the remark."

The witness Klutz testified that "I asked him then how he got the story. He didn't say he got it, and he said: 'Nobody will ever know how the story was gotten.'"

And again Lee stated during the conversation: "He clapped his hand on the paper and said: 'That was a marvelous scoop and it is worth any trouble that we may have.' Something to that effect."

It was shown that a number of persons had sought to ascertain from Lee and Frank "Where they got the story." Lee's reply was to the effect, "Don't you wish you knew?" There was never in any of these conversations a denial by either of these men that they participated in procuring, or were responsible for, the articles in the Washington Herald.

The evidence of the witness Vollten concerning a conversation with David Lee shows his participation in this contempt. Vollten testified: "Q. When was it that you talked to him? A. That was the morning after the publication had come out in the paper, and it was about a little after eleven o'clock. I met David in the hall and I asked him to come into your other office, where the witness room is. I closed the door, and I told him, 'David, I think you are getting dumber and dumber every day you live. I can't imagine why in the world you people write such a story.' He grinned and he didn't make any answer right straight out. I said 'Dave, you can't make me believe you didn't write that story, because it is your style, and I know you were out here, and are here today,

and I just can't make myself believe you didn't write that.' He assured me he did not write it. Shortly before the noon recess, Pat Frank was talking to some newspaper woman reporter at the window in the hall, and I walked up to them, and I told Pat, 'You want to be congratulated for having a lot of dumb reporters.' And he said: 'Why?' And I said, in reference to such a story as is in the newspapers. So Pat turned to me, and he said: 'Well, you can't blame us. It was all the editor's fault. They write the stories. We send them in. The editors are responsible. They are the babies that write the stories, that we pass on to them.' I said to him: 'It would be mighty funny now, if it happened to be the wrong verdict. Don't you think the Herald Newspaper is liable to be sued?' He said, 'Oh, Yes.' So shortly after lunch I had occasion to talk again to Dave, and he passed it off and didn't say anything, just laughed, and he wouldn't say he did and he wouldn't say he didn't. Several days after this incident occurred, David was sitting in there, and I happened to overhear a conversation they had, and he said Vollten come mighty near to doing something. I didn't catch what was said and I asked David three or four minutes later what it was I missed. 'I was just telling how close you come near to getting the fellow who wrote the story.' Then I talked to Pat Frank. He was very nervous. No, I talked to Pat Frank after lunch in the office, and I accused him of writing the story. He wouldn't deny or admit it, but he appeared very nervous. His hand shook and he said he had nothing to say about it. I think that was all of my general conversation with both of them."

An anlysis of this testimony and its application to the question of the guilt *vel non* of the appellants, and ascertaining the bearing it has on the issue and its implications as to both David Lee and Pat Frank in relation to their conduct, should here be made.

The newspaper articles as published, and as they appear in the record, state in part: "The three Judges decided on the guilt after only five minutes of delibera-

tion. But they argued in chambers for thirty minutes more before deciding to make a public announcement that 'the verdict be reserved.' " One judge was quoted as saying: "With Boland's conviction an acquittal in the case of Mrs. Lyddane would not be consistent." "They wondered whether the public would not believe the verdict was decided after a decision in the Lyddane case, if they withheld the verdict, and discussed the advisability of giving a verdict immediately after the jury was selected to try Anne. Finally, they decided to keep their verdict secret in order to insure an impartial trial in the case which starts today." All the above related to the private consultation of the judges in chambers. The statement that one judge is quoted as saying immediately raises the question as to who made this quotation and who reported it. The irresistible inference is that some person, sent to Rockville to report this, did so. These quotations and reports are of such a peculiar nature that the judges would immediately know whether they correspond with what was said and concluded by them in secret conference, and it is a fair inference, and there is testimony to the effect, that these remarks occurred and the conclusion that Boland was found to be guilty actually happened, and this carries with it an implication that by some eavesdropping or some surreptitious plan this information was had, and the only newspaper men who did have it were the reporters of the Washington Herald.

If the report as contained in the paper was untrue, it would be equally contemptuous of the authority and dignity of the court to publish such a statement. Who quoted and reported these statements is conclusively answered by David Lee, one of the appellants, representing the Washington Herald on the scene, and sent for the purpose of covering the case. This is clearly shown in his statement to the witness Benson: "Oh, we know what that is all about. You will read it in the paper in the morning. My story is already in." And so it appeared in the paper. Lee also said, "slapping his

hand on the newspaper article, 'that was a marvelous scoop and it is worth the trouble we may have.' " And these are the stories that the Washington Herald stated were exclusively published by it.

As to the participation of Pat Frank in connection with the publication, his statements are not conclusive as those of David Lee. Referring to the publication, he said, when questioned concerning it: "Well, you can't blame us. It is all the editors' fault. They write the stories. We send in. The editors are responsible. They are the babies that write the stories that we people send in to them."

These are statements of the appellants regarding their participations in the chain of events relating to the contempts.

In these appeals we are required by the terms of the statute to pass upon all the facts, as well as the law. Every fact and every circumstance, as they relate to each of the appellants, must be carefully considered and weighed. The conviction or acquittal of one cannot, in itself, bring about the conviction or acquittal of the other. Independently of the direct oral testimony contained in the record, the facts and circumstances herein raise a grave suspicion as to the guilt of both of these parties, but that is not enough. The question is: Does this testimony, taken as required under the statute, prove guilt with that degree of certainty which the law requires? Testimony as to statements of both Lee and Frank was given at considerable length by witnesses who stand uncontradicted and whose credibility is not questioned. Therefore, it must be accepted as true and given the force and effect to which it is entitled. Lee's statement is direct. That of Frank establishes only an inference and is susceptible of more than one construction. It may be contended that he was speaking generally of the habits, duties, and customs of reporters and editors for the Washington Herald in handling items of news rather than making an admission that he participated in the contempt. The statement being suscept-

ible of two inferences, the one favorable to the accused must be accepted. Besides this, the language used by Frank does not definitely implicate him, and without this, however grave the suspicion, we cannot convict him under the facts contained in the record, and in view of the requirements of the law.

David Lee has so implicated himself by his definite and direct statements, when taken in connection with the other facts and circumstances in the case, that his guilt is clearly shown, and the judgment as to him (No. 57) must be affirmed.

In view of what we have said, we must reverse as to Pat Frank (No. 58).

In Nos. 81 and 82 the appeals are dismissed. They present only repetitions of objections already made to the original judgments.

*In the case of David Lee, No. 57, judgment affirmed, with costs. Judgment in the case of Pat Frank, No. 58, reversed. In the case of Pat Frank, No. 81, appeal dismissed, costs to be paid by the appellant. In the case of David Lee, No. 82, appeal dismissed, costs to be paid by the appellant.*

BOND, C. J., filed the following dissenting opinion in the case of Frank, No. 58:

As the appellant Frank declined to answer and purge or clear himself of the contempt if he could, I have not been able to agree that a distinction may be made in his favor. The evidence of statements made by him tends to implicate rather than to clear him.